DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

EHI ACQUISTIONS, LLC,

Plaintiff,

-v.-

UNITED STATES OF AMERICA,

Defendant.

3:22-cv-00044

OPINION AND ORDER

## MEMORANDUM OPINION AND ORDER

CHERYL ANN KRAUSE, Circuit Judge, sitting by designation.

Plaintiff EHI Acquisitions, LLC, has brought this action against the United States to quiet title to the Caneel Bay Resort in St. John, Virgin Islands. Before the Court are Plaintiff's motion for summary judgment; the United States' motion to dismiss for failure to state a claim or, in the alternative, for summary judgment; and various motions in limine. We will GRANT the United States' motion for summary judgment and DENY Plaintiff's motion for summary judgment. All pending motions in limine are DISMISSED AS MOOT.

I. Background

On December 1, 1956, Jackson Hole Preserve, Inc. (JHPI), a conservation nonprofit run by Laurance Rockefeller, gave five thousand acres on the island of St. John to the United States Government. Earlier that year, Congress had authorized the creation of the Virgin Islands National Park, 16 U.S.C. §§ 398–398f, and Rockefeller's donation served

1

as the park's founding gift. Rockefeller retained a 150-acre parcel on Caneel Bay, a picturesque spot on a peninsula that juts out from St. John's northwest corner. There, he operated the Caneel Bay Resort.

In 1977, for reasons the record does not make clear, Rockefeller created a corporate structure that would sever ownership of the resort's land from that of its buildings for a period of 30 years. In exchange for ten dollars, JHPI took title to the land, while another Rockefeller entity, Caneel Bay, Inc., retained the structures and other improvements from December 29, 1977 until December 31, 2007, when title to those structures and improvements would transfer to JHPI. Along with the deed, these entities executed a lease through which JHPI leased the land on which the structures stood back to Caneel Bay, Inc. for that 30-year period. Thus, had nothing changed, the structures and improvements would have reverted to JHPI on December 31, 2007, reuniting the land and buildings and making JHPI the sole owner of a profitable resort.

But things did change, because Rockefeller's long-term goal was an altruistic one. In 1982, he wrote to then-Secretary of the Interior James Watt to offer the resort to the United States Government. In his letter, Rockefeller told Watt that it had been JHPI's "long-term objective" to make the resort part of Virgin Islands National Park. Letter from Laurance Rockefeller to James Watt at 1 (Mar. 2, 1982), ECF No. 19-1 (Rockefeller Letter). To that end, Rockefeller proposed that JHPI donate the resort's land to the United States while retaining the exclusive right to use the property for thirty years. According to Rockefeller, "[a]t the end of this time"—presumably, on or after December 31, 2007, when the structures and improvements reverted from Caneel Bay, Inc. to JHPI—"JHPI would

2

also donate the buildings and other facilities at Caneel Bay to the National Park Service." *Id.*

Rockefeller's plan was reduced to writing in the document now at the heart of this litigation. In an indenture executed by the Government and JHPI on September 30, 1983 (the "Indenture"), JHPI gave the United States title to the resort's land, while Caneel Bay, Inc. continued to own the improvements. The Indenture also created a new interest in the property, a so-called "Retained Use Estate" (RUE), which gave JHPI the exclusive right to use and occupy the resort until September 30, 2023. That right was not absolute: In a paragraph entitled "Maintenance of Premises by Grantor Prior to Termination of Retained Use Estate," the Indenture stated:

> It is Grantor's [i.e. JHPI's] expectation and intention that at some future time . . . the Retained Use Estate will be terminated and extinguished in order to carry out the longstanding objective of Grantor that the Premises ultimately be an integral part of the Virgin Islands National Park . . . for the use and enjoyment by visitors to the Park of the outstanding scenic and other features of national significance located both within the Premises and in other areas of the Park. In keeping with this objective, Grantor agrees that, at all times prior to the termination of the Retained Use Estate . . . Grantor will use and maintain the Premises in such a manner that will (a) be consistent with the preservation of such outstanding scenic and other features of national significance and (b) preserve the Premises to the extent feasible in their natural condition for the public benefit, enjoyment and inspiration, subject, however, to the right of Grantor to operate guest facilities for the accommodation of visitors to the Park . . . .

1983 Indenture at 2, ECF No. 1-3. The Indenture allowed JHPI to transfer the RUE, so long as the transferee agreed to fulfill the conservation duties just described. As to exchange for value, the Indenture explained that "[t]his conveyance is by way of gift,

3

without consideration except the nominal consideration" of the one dollar that was recited earlier in the document. *Id.* at 6.

JHPI was required to keep the RUE for the first three years of its existence, i.e., until September 30, 1986. After that date, however, it was permitted to terminate the RUE before the September 30, 2023 expiration. Paragraph 8 of the Indenture set out the procedure for this early termination. First, JHPI (or its successor) was required to give the Government at least one year's notice of its intent to terminate, including an offer "to convey and transfer" to the Government "all improvements located on the Premises" upon the RUE's extinction. *Id.* at 4. The Government would then have until 180 days before the termination date to decide if it wished to accept title to the improvements. If it did—and if, within one year of the RUE's termination, it decided to continue operating "public accommodations, facilities, and services" on the premises—it was to give JHPI or its successor the chance to bid to provide those services. *Id.* at 5.

If, on the other hand, the Government declined to accept title to the improvements, then title to the land would revert to JHPI "automatically and without further deed." *Id.* The land would also revert to JHPI if the land "or any part thereof shall at any time cease to be included within" Virgin Islands National Park. *Id.*

On the same day that the Government and JHPI executed the Indenture, JHPI and Caneel Bay, Inc. amended their 1977 agreements so that both Caneel Bay, Inc.'s interest in the improvements and its lease on the Premises would run until September 30, 2023—the RUE's expiration date—rather than December 31, 2007. Thus, after the Indenture's execution, three entities held interests in the land and improvements at Caneel Bay Resort:

4

The United States owned the land; Caneel Bay, Inc. leased the resort's land from JHPI and held title to the improvements until September 30, 2023; and JHPI held the RUE, the lessor's interest in the land, and the future interest in the improvements. As long as JHPI and Caneel Bay, Inc. remained in the picture, Rockefeller's idyllic vision seemed just over the horizon.

But it was not to be smooth sailing. Three years after signing the Indenture, JHPI assigned all its interests in the resort to RockResorts, Inc., and in the following decades, the interests in Caneel Bay changed hands several times, except for title to the land, which the United States continued to own subject to the RUE. By 2017, Plaintiff EHI Acquisitions, LLC (EHIA) had acquired the present and future interests in the improvements, the lessor's interest in the land, and the RUE. Its affiliate, CBI Acquisitions, Inc. (CBIA), held the lessee's interest in the land, and together, they ran and made various improvements to the resort, which drew more than 15,000 guests per year and served as St. John's largest employer.

That all came to a jarring halt in September of 2017, when Hurricanes Irma and Maria caused catastrophic damage to St. John, including Caneel Bay. The resort was shuttered, and it quickly became apparent to EHIA and CBIA that they would need a significant infusion of cash—or at least the assurance of a significant future cash stream—to make the repairs and improvements necessary to reopen. EHIA and CBIA initially attempted to negotiate an extension of the RUE with the Government, but those talks proved unsuccessful.

So, on April 30, 2019, the entities made a new proposal. Homing in on the language in the Indenture, Gary Engle, the "Authorized Representative" of both EHIA and CBIA, sent a letter to then-Secretary of the Interior David Bernhardt giving notice of EHIA's intent to terminate the RUE pursuant to Paragraph 8 of the Indenture and to transfer the improvements to the Government. Letter from Gary D. Engle to David Bernhardt at 3 (Apr. 30, 2019), ECF No. 19-5. But as a condition of that transfer, Engle demanded a payment of $70 million, as well as a release and indemnification by the Government "from all environmental liabilities related to the RUE and related to the Caneel Bay land and Improvements." *Id.* at 3.

The Government balked, denying that the letter was an effective notice of termination and describing EHIA's demand for payment and indemnification before conveyance as "at odds with both the terms of the Indenture and the clear donative intent described therein." Letter from Daniel H. Jorjani to Gary D. Engle at 2 (June 11, 2019), ECF No. 19-6. The Government offered to negotiate an end to the RUE "in a manner that would be beneficial to all parties, as well as to residents of the Virgin Islands and the American People," *id.* at 1, but the parties could not reach consensus: Engle maintained that his letter constituted a valid offer under Paragraph 8 and that, because the Government had not accepted the offer by 180 days before the purported termination date, title to the resort land had "automatically reverted to EHI[A] and CBIA." Letter from Gary D. Engle to Rob Wallace at 1 (Dec. 11, 2019), ECF No. 38-14. The Government, meanwhile,

steadfastly refused to acknowledge the letter as an effective notice of termination in the first place.[1]

As a result, EHIA filed this suit to quiet title on June 30, 2022. On March 3, 2023, the United States filed a motion to dismiss for failure to state a claim under Rule 12(b)(6) or, in the alternative, for summary judgment. A few months later, EHIA filed its own motion for summary judgment. This Court now resolves those dispositive motions.

## II.     Legal Standard

In a contract interpretation dispute, "summary judgment is appropriate only where the contractual language is unambiguous—*i.e.* subject to only one reasonable interpretation." *Mylan Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413, 418 (3d Cir. 2013) (citation omitted). "We apply the forum's contract interpretation law unless the contract has a choice-of-law provision." *Williams v. Medley Opportunity Fund II,* 965 F.3d 229, 238 (3d Cir. 2020) (citation omitted). The Indenture contains no such provision, so the Court will apply the law of the Virgin Islands.

---

[1] The record shows that the parties discussed a possible lease arrangement and held at least one meeting, but these attempts were evidently unsuccessful. *See* Letter from Rob Wallace to Gary D. Engle at 1 (Feb. 6, 2020), ECF No. 38-15. Two attempts at mediation after EHIA filed suit also failed. *See* ECF Nos. 45, 136.

**III.   Discussion**[2]

The dispute between EHIA and the United States hinges on the meaning of the word "offer" as it is used in the Indenture.  EHIA maintains that it means "to offer in exchange for value," while the Government says it means "offer to convey at no cost."  Applying the relevant principles of contract interpretation, we agree with the Government: The Indenture evinces an unambiguous intent to convey both the resort's land and its improvements to the United States upon the RUE's termination "by way of gift, without consideration except the [$1.00] nominal consideration" set forth in the Indenture.  1983 Indenture at 6.  EHIA's interpretation is contrary to that intent, which is further confirmed by the relevant extrinsic evidence.

**A.   Interpretation and Construction of the 1983 Indenture**

The Indenture is a kind of deed.  *See Indenture*, Black's Law Dictionary (11th ed. 2019) ("A deed or elaborate contract signed by two or more parties.").  The Supreme Court of the Virgin Islands has held that "[a] deed is a contract, and thus in most circumstances the principles of contract interpretation govern." *Streibich v. Underwood*, 74 V.I. 488, 502 (2021).  When we read a contract, "our primary purpose is to ascertain and give effect to the parties' objective intent."  *Phillip v. Marsh-Monsanto*, 66 V.I. 612, 624–25 (2017). "Objective intent" refers to what the contract's words "would mean in the mouth of a

---

[2] This Court has jurisdiction pursuant to 28 U.S.C. § 1346(f), which gives district courts original and exclusive jurisdiction over civil actions to quiet title to "real property in which an interest is claimed by the United States."

normal speaker of English, using them in the circumstances in which they were used." *Id.* at 625 (quoting *United Corp. v. Tutu Park Ltd.*, 55 V.I. 702, 719 n.14 (2011)).

As that language suggests, the Court does not conduct its inquiry in a vacuum; it "reads the contract in the context in which it was made," considering, among other things, "the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning." *Pacitti v. Macy's*, 193 F.3d 766, 773 (3d Cir. 1999) (Alito, J.) (quoting *Hullett v. Towers, Perrin, Forster & Crosby, Inc.*, 38 F.3d 107, 111 (3d Cir. 1994)); *see also* 11 *Williston on Contracts* § 32:7 (4th ed. 2023) ("Ordinarily, the circumstances surrounding the execution of a contract may always be shown and are relevant to a determination of what the parties intended by the words they chose."). While the parol evidence rule bars parties from introducing evidence of agreements made before or at the same as the contract, it does not forbid courts from looking at "the relations of the parties, their connection with the subject-matter of the contract, and the circumstances under which it was signed." *Chicago, R.I. & P. Ry. Co. v. Denver & R.G.R. Co.*, 143 U.S. 596, 609 (1892); *see also* 11 *Williston on Contracts* § 32:7.

Our first task is to determine whether the Indenture is ambiguous—that is, whether Paragraph 8 is subject to more than one reasonable interpretation when it requires the RUE's holder to pair any notice of intent to terminate the RUE with "an offer . . . to convey and transfer [all improvements on the Premises] to" the United States. 1983 Indenture at 4.

As it is ordinarily used, "offer" means "to present for acceptance or rejection: hold out." *Offer*, Merriam-Webster's Unabridged Dictionary, https://unabridged.merriam-

webster.com/unabridged/offer (last visited Apr. 9, 2024). The term typically carries the same meaning in legal parlance. The edition of *Black's Law Dictionary* that was current when the Indenture was executed defines "offer" as "[a] proposal to do a thing or pay an amount, usually accompanied by an expected acceptance, counter-offer, return promise or act." *Offer*, *Black's Law Dictionary* (5th ed. 1979); *see also Offer*, *Black's Law Dictionary* (11th ed. 2019) ("The act or an instance of presenting something for acceptance; specif., a statement that one is willing to do something for another person or to give that person something . . . ."). As a purely textual matter, then, "offer" does not mean "offer to sell"; it simply means "to present for acceptance or rejection."

Yet our inquiry is not confined to dictionaries. What matters most is what the parties understood the term to mean in the context in which they used it. Examining the plain language of Paragraph 8 in the context of the whole Indenture, we are convinced that this meaning was entirely philanthropic.

Paragraph 8, by its terms, says only that a termination notice shall be accompanied by "an offer . . . to convey and transfer" title to the improvements. 1983 Indenture at 4. It does not say that the Grantor shall make "an offer to convey for value" or "an offer to sell." Indeed, commercial language like "bargain" or "fair market value" is conspicuously omitted from the Indenture. When parties use clear and unambiguous terms, we will not insert additional terms that are contrary to the parties' plain meaning. *Weary v. Long Reef Condo. Ass'n*, 57 V.I. 163, 169–70 (2012); *see also Williams v. Metzler*, 132 F.3d 937, 947 (3d Cir. 1997) ("Absent indicia that, at the time the contract was executed, the parties assigned a specialized meaning to an otherwise common term, we will not alter its accepted

10

usage."). Thus, here, the plain language of Paragraph 8 indicates that the parties did not intend to make the improvements' transfer contingent on payment.

That meaning is bolstered by the surrounding provisions of the Indenture. For one, the Indenture's conclusion explicitly states that "[t]his conveyance is by way of gift, without consideration except the nominal consideration hereinabove recited." 1983 Indenture at 6. While "[t]his conveyance" refers to the 1983 transfer of the land—not the future transfer of the improvements—the statement nonetheless shows that "offer" means "offer as a gift" concerning the improvements as well. Why? Because the Indenture's reversion clause ties the land and improvements together. To keep the land, the Government would have to accept the offer of the improvements. But if that offer were conditioned on payment, then the Government's retention of the land, in effect, also would be conditioned on payment beyond the stated consideration of one dollar—meaning it would no longer be a gift. That result would be contrary to the parties' stated intention, which we are bound to honor.

Paragraph 2 of the Indenture also could not be clearer as to JHPI's "expectation and intention":

> [A]t some future time . . . the Retained Use Estate will be terminated and extinguished in order to carry out the longstanding objective of Grantor that the [Resort] ultimately be an integral part of the Virgin Islands National Park . . . under the jurisdiction of the Secretary for the use and enjoyment by visitors to the Park of the outstanding scenic and other features of national significance located both within the [Resort] and in other areas of the Park.

1983 Indenture at 2. The unmistakable import of this paragraph is that the parties, both nonprofit entities, desired the Caneel Bay Resort to become part of the Virgin Islands

11

National Park "for the public benefit." *Id.* That purpose, stated at the Indenture's outset, makes plain that both the Government's receipt of the land in 1983 and its receipt of the improvements in 2023 or at an earlier "future time . . . [when] the Retained Use Estate [was] terminated" were intended as gifts. *Id.* at 3.

Finally, contrary to what EHIA claims, the Indenture does not treat the transfer of the improvements differently depending on whether the RUE is terminated early or terminated upon expiration. The Indenture is instead structured so that however the RUE ends, the land and improvements wind up in a single set of hands: either the Government's (if it accepts the improvements and incorporates the resort into the National Park) or the Grantor's (if the Government declines the improvements or excludes some part of the resort from the Park). This reversion mechanism is consistent with the parties' stated intent that the Park "ultimately be an integral part" of the National Park "for the public benefit." 1983 Indenture at 2. The gift of the resort to the United States is contingent—not on payment, which is nowhere mentioned in the Indenture—but on the Government's willingness to abide by JHPI's expressly philanthropic vision for Caneel Bay.

EHIA's interpretation of "offer" is not only unsupported by the Indenture's text and structure, but also raises significant obstacles to the contract's implementation. First, it would allow the Grantor to demand payment for early termination at any point between September 30, 1986 and September 30, 2022.[3] In effect, then, EHIA asks us to accept the far-fetched conclusion that in signing the Indenture, the Government agreed to give JHPI

---

[3] Recall that the Indenture requires the Grantor to give a year's notice of intent to terminate the RUE. Thus, the latest it could do so would be September 30, 2022.

a 36-year option to suddenly demand that it pay an unknown number of millions of dollars or else forfeit several hundred acres of prime beachfront property.

EHIA attempts to minimize the practical difficulties of holding that the Government agreed to be prepared to spend millions of dollars at any point across three and a half decades. For instance, it says that the Department of the Interior could have paid its $70 million asking price from one of several discretionary pools in government fiscal year 2019. Yet it offers no evidence that the Department's discretion over these funds was unfettered. Nor does it consider the Department's other budgetary demands, or the regulatory prerequisites it may need to satisfy before funds can be released—environmental review, for instance. In any event, the question before us is not whether the Department of the Interior could in fact meet EHIA's price; it is whether the parties intended a sale when they executed the Indenture. Every indication is to the contrary.

Second, EHIA's reading of "offer" would have an absurd consequence: EHIA concedes that if the RUE were allowed to expire, the improvements would go to the United States at no cost, yet it maintains that the Government must pay for the improvements if the RUE is terminated early. Under EHIA's interpretation of the Indenture, it is difficult to imagine why any rational actor would allow the RUE to expire, when doing so would mean giving the Government for free what it could have offered the government at a price—with the sweetener that if the Government declined, the RUE's owner would keep its money and acquire premium property at no cost. True, these considerations may not have motivated JHPI, a conservation nonprofit tied to the Rockefeller family. But the Indenture allowed JHPI to convey the RUE to a successor, including one that operates for profit. That is

13

precisely what happened, and in the eyes of a for-profit entity, the choice between letting the RUE expire and terminating it early is no choice at all. Because "[a]ny [ ] reading which renders contract provisions pointless, superfluous, or ineffective violates basic notions of contract interpretation, and leads to an absurd result which should not be entertained," *Weary*, 57 V.I. at 175 (Hodge, C.J., concurring), we will not adopt an interpretation of "offer" that nullifies the possibility that the RUE could expire.

In sum, had the parties wished to create an anomalous commercial exception to this explicitly charitable scheme—namely, to require the Government to pay for the improvements if and only if the RUE ended early—they would have said so. They did not. Focusing instead on what the parties *did* say, we conclude that "offer" unambiguously means "to present for acceptance or rejection." *Offer*, Merriam-Webster's Unabridged Dictionary, https://unabridged.merriam-webster.com/unabridged/offer (last visited Apr. 9, 2024).

### B. EHIA's Arguments to the Contrary

EHIA raises a number of arguments to the contrary. None is persuasive.

First, EHIA argues that "[i]n a legal or contractual context, 'offer' is a well-known term of art, especially when 'offer' is paired with 'acceptance.'" Pl's Mem. Supp. Summ. J. at 10, ECF No. 84. Because the Indenture is a contract, EHIA reasons that "offer" must mean "a manifestation of willingness to enter into a bargain"—in this case, to sell the improvements to the United States for value. *Id.* at 11 (quoting Restatement (Second) of Contracts § 24 (1981)). Although "offer" and "acceptance" are often used together in contractual settings, EHIA cites no precedential authority—and this Court can find none—

14

holding that "offer" is a term of art in contract law. Even if it were, our task would not be to interpret "offer" in the context of *any* contract but instead to interpret the word in the context of *this particular contract*. When that context "show[s] that the parties intended a meaning different from the technical or mercantile meaning, that other meaning will be honored." 11 *Williston on Contracts* § 32:4. This exception follows from "our primary purpose" in interpreting a contract: "to ascertain and give effect to the parties' objective intent." *Phillip*, 66 V.I. at 624–25. *See also Bristow v. Drake Street Inc.*, 41 F.3d 345, 353 (7th Cir. 1994) (Posner, J.) (cautioning courts to "[b]eware terms of art in law" because "[w]e must attend to what [the parties] meant by [their] use of the term."). Here, the context shows that JHPI ultimately intended to donate the Caneel Bay Resort to become "an integral part of the Virgin Islands National Park . . . under the jurisdiction of the Secretary [of the Interior]." 1983 Indenture at 2. EHIA's reading of "offer" is squarely at odds with that intent.

Second, EHIA argues that the analysis set out by the Virgin Islands Supreme Court in *Banks v. Int'l Rental & Leasing Corp.*, 55 V.I. 967 (2011) confirms its reading of "offer." Yet a *Banks* analysis is inappropriate in this case. That test, which is designed to ascertain whether a Restatement should supply a rule of common law in the Virgin Islands, applies only "when considering a question not foreclosed by prior precedent from" the Supreme Court of the Virgin Islands. *Gov't of V.I. v. Connor*, 60 V.I. 597, 603 (2014). *See also Banks*, 55 V.I. at 980 (observing that the Supreme Court of the Virgin Islands possesses the "supreme judicial power to shape the common law" in its jurisdiction). The Supreme Court of the Virgin Islands has stated on numerous occasions the rule governing contract

15

interpretation. Specifically, it has held that courts should construe contracts "according to their plain meaning within the context of the document as a whole." *Weary*, 57 V.I. at 170. *See also, e.g., Tutu Park*, 55 V.I. at 719 n.14 (describing a court's job in interpreting a contract as determining "what [the parties'] words would mean in the mouth of a normal speaker of English, using them in the circumstances in which they were used") (emphasis omitted). That clear precedent governs this case, and so EHIA's use of a *Banks* analysis is unavailing here.

    Finally, EHIA argues that the six months that Paragraph 8 gives the Government to decide whether to accept a termination offer "make sense only for an offer to transfer the Improvements for value." Pl.'s Mem. Supp. Mot. Summ. J. at 16, ECF No. 84. It says that if the Government were to receive the land for free, "it has no decision to make," for "it is always better to receive free improvements (regardless of their condition) than give up 150 acres of real property. That decision does not require six months of deliberation." *Id.* EHIA provides no evidence that commercial considerations motivated the stipulated response time, and it overlooks the many other plausible reasons the drafters may have had for creating a six-month interlude (e.g, assessing the resort's condition, finding a concessionaire, ensuring legal authority and budgetary capacity to manage the land, etc.). Accordingly, this argument, too, fails to persuade.

### C. Extrinsic Evidence

Because we find that the contract is unambiguous, we need not consult extrinsic evidence to aid our interpretation. However, for the sake of completeness, we will briefly discuss that evidence, which uniformly supports the Government's position.

Under Virgin Islands law, "'if the court finds that a contract is ambiguous and that the extrinsic evidence is undisputed, then the interpretation of the contract remains a question of law for the court to decide' at the summary judgment stage." *White v. Spenceley Realty*, 53 V.I. 666, 678–79 (2010) (emphasis omitted) (quoting *In re Columbia Gas Sys. Inc.*, 50 F.3d 233, 241 (3d Cir. 1995)). EHIA argues that only certain types of extrinsic evidence are admissible, drawing a distinction between evidence about the party's language and evidence about the party's expectations. However, the case it cites for this proposition, *Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 92 (3d Cir. 2001), was applying Pennsylvania law. *See* Pl.'s Resp. Order Supp. Br. at 12–13, ECF No. 145. We find no such distinction in the law of the Virgin Islands.

Three contemporaneous pieces of undisputed extrinsic evidence are especially relevant to this case. Most important is the letter that Laurance Rockefeller sent Interior Secretary Watt in 1982 to propose the transfer of Caneel Bay Resort. In the letter, Rockefeller suggests that the parties meet to discuss a proposal to "donate the Caneel Bay land inholding to the United States Government for inclusion in the Park," subject to a thirty-year reservation of use, at the end of which "JHPI would also donate the buildings and other facilities at Caneel Bay to the National Park Service." Rockefeller Letter at 1. Second, in a press release dated October 5, 1983, the parties announced that JHPI had the

previous day "donated … approximately 150 acres of land at Caneel Bay" and agreed that at the end of the RUE, "the improvements also will be donated to the federal government." ECF No. 38-9 at 1.  The press release appears to be a joint production of the two parties, as it contains contact information for both the National Park Service and an office at Rockefeller Plaza.  Finally, in a "Statement of Closing" dated November 21, 1983, JHPI's lawyers wrote that "JHPI covenanted an offer to donate the Improvements to the Park Service at the end of the Retained Use Estate."  ECF No. 38-12 at 2.  Thus, individually and as a whole, these documents show that the parties shared an understanding that "offer" meant "an offer to convey at no cost."

### D. Enforceability of the Gift

Finally, EHIA contends that if the Indenture does require the improvements to be conveyed at no cost, the conveyance would be unenforceable because it is not supported by consideration.  Specifically, EHIA posits that although the Indenture recites nominal consideration of one dollar, that consideration supports only the 1983 transfer of the land to the United States and not the future conveyance of the improvements at the RUE's termination.  It argues that if "offer to convey and transfer" does not mean offer for value, then the "offer" is merely an unenforceable promise to make a gift.

Not so.  EHIA fails to appreciate that a single consideration can support multiple promises, and it was clearly intended to do so here.  As Section 80 of the Restatement (Second) of Contracts provides, "[t]here is consideration for a set of promises if what is bargained for and given in exchange would have been consideration for each promise in the set if exchanged for that promise alone."  In the Indenture, JHPI promised (1) to transfer

the land to the United States immediately, and (2) to offer to convey the improvements to the United States if it sought early termination of the RUE. These promises were made "for and in consideration of One ($1.00) Dollar . . . paid by Grantee to Grantor, the receipt and sufficiency of which is hereby acknowledged." 1983 Indenture at 1. Thus, the one-dollar consideration supports both promises, making them legally binding. *See also* Restatement (Second) of Contracts § 71 comment c (exchange of consideration for a promise to make a gift can create enforceable contract). Moreover, in exchange for JHPI's promise to offer to convey the improvements upon early termination, the United States promised (1) to either accept the improvements or to relinquish title to the land, and (2) to give JHPI or its successor "a reasonable opportunity" to provide guest services should the Government accept the improvements and continue to operate public accommodations at Caneel Bay, 1983 Indenture at 5. *See Julien v. Matthew*, No. 2022-0023, 2024 WL 1298481, at *5 n.5 (V.I. 2024) (quoting Restatement (Second) of Contracts § 71) (noting that a return promise can constitute consideration when it is bargained for).

Those promises were exchanged between the United States and JHPI, but as JHPI's successor and the holder of the interest in the improvements, EHIA assumed JHPI's obligation under Paragraph 6 to offer to convey the improvements should it seek to terminate the RUE before its natural explanation. *See also* 2003 Indenture at 3, ECF No. 21–5 (conveying present and future interest in improvements to EHIA subject to the "obligations . . . to convey and transfer fee title in and to the Improvements" on the RUE's expiration date or in the event the United States declines offer of the conveyance). The

19

consideration provided for that conveyance, though nominal, suffices to render that obligation enforceable.

## IV. Conclusion

Having examined "offer" as it is used "in the context of the entire agreement," *Tutu Park*, 55 V.I. at 713, we find that the term unambiguously means "an offer to convey the improvements free of charge." Therefore, EHIA's offer to sell the improvements to the United States for $70 million and indemnification was not a valid offer for purposes of the indenture, including Paragraph 8. Accordingly, we will GRANT Defendant United States' motion for summary judgment. The RUE having expired on September 30, 2023 without a valid offer from EHIA, title to the resort's land remains with the United States, and title to the improvements thereon shall be conveyed and transferred to the Department of the Interior forthwith.

Plaintiff's motion for summary judgment is DISMISSED. All pending motions in limine are DISMISSED as MOOT.

SO ORDERED.

Dated: April 18, 2024

By the Court,

*/s/ Cheryl Ann Krause*

CHERYL ANN KRAUSE
United States Circuit Judge
